Kenneth L. DRAKE d/b/a Machias
Valley Nursing Home, Inc., et al.

v.

David E. SMITH, Commissioner of Maine
Department of Human Services.

Supreme Judicial Court of Maine.

Aug. 31, 1978.

Farris & Foley, P.A., by Ralph W. Farris, Jr. (orally), Augusta, for plaintiff.

Rudman, Winchell, Carter & Buckley by Robert E. Sutcliff, Gene Carter, Bangor, for plaintiffs/intervenors.

Sarah L. Downs (orally), Joseph M. Kozak, Asst. Attys. Gen., Department of Human Services, Augusta, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

On July 28, 1970 plaintiff Kenneth L. Drake d/b/a Machias Valley Nursing Home, Inc., commenced a civil action in the Superior Court (Kennebec County) claiming that the named defendant, Dr. Dean Fisher, in his capacity as Commissioner of the department of government of the State of Maine then known as the Department of Health & Welfare, had acted wrongfully in reducing the payments made by his Department to plaintiff's nursing home from $350.00 per patient per month to $260.00 per patient per month. Plaintiff asked for damages computed on the basis of the $90.00 differential per patient per month. Initially, plaintiff's claim of damages was limited to the month of June 1970, but plaintiff later amended his complaint to ask damages, additionally, for the months of July and August 1970.

On October 7, 1974 the parties [1] agreed to a reference of the case with rights of appeal reserved (Rule 53 M.R.Civ.P.). After a hearing the Referee found in favor of plaintiff. More specifically, the Referee decided that the failure of plaintiff to meet licensing requirements did not justify the reduction in payments because (1) defendant Commissioner had lodged no complaint about the quality of the care rendered at the plaintiff's nursing home; (2) until August 5, 1970 the Commissioner had taken no action to close the plaintiff's facility for non-compliance with State licensure requirements; (3) the facility had continued in operation without the corrections required by the State Inspectors; and, (4) notwithstanding that the nursing home was an unlicensed facility during the months at issue, since in all the circumstances both plaintiff and the Commissioner "were seeking to provide a firm basis for continuance of the nursing home service[s]", the services rendered by plaintiff on the Commissioner's authority were sufficient to entitle plaintiff to the payments demanded in plaintiff's complaint.

While the report of the Referee was awaiting action upon it by a Justice of the Superior Court, a statute was enacted changing the Department of Health & Welfare into the Department of Human Services, and David E. Smith became the Commissioner of the Department of Human Services. In view of these circumstances David E. Smith in his capacity as Commissioner of the Department of Human Services was ordered substituted as the defendant in the action.

Ultimately, the Justice presiding in the Superior Court accepted the report of the Referee which recommended in terms that judgment be entered against "Dean Fisher, Commissioner of the State of Maine Department of Health & Welfare, *or his successor.*" (emphasis supplied) Accordingly, judgment was entered in the Superior Court adjudicating that the action of the defendant was unlawful and awarding plaintiff damages in the amount of $10,987.60.

From this judgment defendant has appealed.

We conclude that the sovereign immunity of the State of Maine requires that we sustain the appeal and order dismissal of plaintiff's action.

*1.*

The issue of the sovereign immunity of the State of Maine was not raised in this proceeding until after the report of the Referee had been filed and was pending for action upon it by the Justice presiding in the Superior Court. For this reason, plain-

---

1. While this action was pending, plaintiff Drake went out of the business of running nursing homes. He assigned some of his rights in any judgment recovered in this case to two of his creditors Arthur Chapin Co. and Currie & Casion Oil Co. On February 27, 1974 said assignees were permitted to intervene as parties plaintiff.

tiff contends that it must be deemed waived for the purposes of this proceeding.

■ We disagree. The immunity of the sovereign from suit is one of the highest attributes inherent in the nature of sovereignty. Accordingly, the large majority of jurisdictions hold it necessary that the sovereign's consent to be sued be given by the Legislature, as the only appropriate body to speak in this regard on behalf of the sovereign. In the absence of specific authority conferred by an enactment of the Legislature, therefore, the sovereign's immunity from suit cannot be waived through the imposition of procedural requirements or be deemed forfeited by procedural defaults. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Bullock v. Electro-Science Investors, Inc.*, 533 S.W.2d 892 (Tex.Civ.App.1976); *Horak v. State*, 171 Conn. 257, 368 A.2d 155 (1976); *Charles E. Brohawn Bros. v. Board of Trustees of Chesapeake College*, 269 Md. 164, 304 A.2d 819 (1973); *Orange County v. Heath*, 282 N.C. 292, 192 S.E.2d 308 (1972); *Hathaway v. New Mexico State Police*, 57 N.M. 747, 263 P.2d 690 (1953); *McNair v. State*, 305 Mich. 181, 9 N.W.2d 52 (1943); but see *Lister v. Board of Regents of the University Wisconsin System et al.*, 72 Wis.2d 282, 240 N.W.2d 610, 619, 620 (1976).

We adopt this large majority view.[2] Finding it presently unnecessary to analyze whether the end result is to be rationalized on jurisdictional grounds (see *Edelman v. Jordan,* supra; *Hathaway v. New Mexico State Police,* supra) or in terms of the absence of a cause of action (*McNair v. State*, supra), we conclude that we must take cognizance in this appeal of the merits of the issue of the sovereign immunity of the State of Maine.

2.

The essence of the instant action is that plaintiff wants to recover money, and even though a State official is the nominal defendant in the action, plaintiff makes no claim that the named defendant has a *personal liability* to pay the money plaintiff seeks to recover. Rather, the liability to pay money to plaintiff is asserted as arising by virtue of the named defendant's activity in his official capacity as a public officer of the State of Maine. This is shown not only by the substitution as party defendant of the person who succeeded the originally named defendant in office but also by the report of the Referee adjudicating that the liability is against the originally named Commissioner or his *successor* in office. Moreover, the judgment entered in the Superior Court is not directed to the original defendant but is against his successor in office.

■ Plainly, then, the reach of the present action is against the State of Maine as the party to be adjudicated liable to pay the money claimed by plaintiff. Thus, even though action has been brought nominally against a State official, the State of Maine is a necessary party to the action, and sovereign immunity has applicability[3] to require dismissal of the action unless the

---

2. In *Isaacson v. Husson College*, Me., 297 A.2d 98, 102 (1972) it is stated in dictum that the "defense of charitable immunity, like that of *governmental* immunity, is an affirmative defense." (emphasis supplied) It should be noted that "governmental" immunity is the phrase generally employed to identify the immunity of governmental subdivisions of the State and is thus to be distinguished from the State's own immunity as the *sovereign*. See *Davies v. City of Bath*, Me., 364 A.2d 1269, 1273 n. 9 (1976).

3. *Kerr v. State of Maine*, 127 Me. 142, 142 A. 197 (1928) gives clear indication that the sovereign immunity of the State of Maine extends to actions which purport to assert a liability against the State other than liability in tort. See also *Austin W. Jones Company v. State of* Maine, 122 Me. 214, 217–222, 119 A. 577 (1923).

This Court's abrogation of the State's immunity to be sued for tort liability in *Davies v. City of Bath*, Me., 364 A.2d 1269 (1976) is without relevance to the instant case. First, the immunity as to tort liability was abrogated prospectively as to causes of action (other than in *Davies* itself) arising on or after February 1, 1977. Second, the ·abrogation of the sovereign's immunity against actions to establish tort liability does not terminate the sovereign's immunity against actions seeking to establish liability other than in tort. See *State ex rel. Division of Administration v. Oliff*, 350 So.2d 484 (Fla.App.1977); *In re Opinion to the Senate*, 108 R.I. 302, 275 A.2d 256 (1971).

State, acting through the Legislature, has given its consent that the present action be brought against it.

█ At oral argument counsel for plaintiff sought to avoid dismissal of the action on sovereign immunity grounds by stating that he would forego a judgment adjudicating liability for payment of money and would accept an adjudication deciding only that the Commissioner was guilty of wrongful action toward plaintiff.

This tactic gains nothing for plaintiff.

First, plaintiff does not thereby provide a proper foundation for an adjudication as to whether the Commissioner had acted in excess of his statutory powers, thus to remove the applicability of sovereign immunity by allowing the action to be characterized as an action (sounding in equity or mandamus) against a State official rather than against the State itself. Here, the error of the Commissioner, if any, was not that he acted outside the bounds of his statutory authority but, rather, that he wrongly exercised statutory powers he plainly possessed. See *Lister v. Board of Regents of the University Wisconsin System et al*, 72 Wis.2d 282, 240 N.W.2d 610, 622, 623 (1976).

Second, in any event the circumstances of this case would preclude resort to merely declaratory relief. Absent an undertaking to have the State pay money to the plaintiff as plaintiff's due, a merely declaratory adjudication concerning the Commissioner's actions relative to plaintiff would serve no useful purpose, and the case would thus lose justiciability. The matters involved occurred almost 8 years ago, and plaintiff has gone out of the nursing home business. It is plain, therefore, that a declaration whether the Commissioner acted erroneously toward plaintiff will not serve to govern, or assist, the plaintiff and the Commissioner in any relations likely to exist between them in the immediate future. In this respect, the case at bar is patently different from *Ottman v. Fisher, Commissioner*, Me., 319 A.2d 56 (1974) and *Brooks v. Smith, Commissioner*, Me., 356 A.2d 723 (1976). Moreover, the issues involved are capable of being adjudicated in other litigation to provide guidance for official conduct and lack

the kind of public importance which might otherwise induce this Court, on public interest grounds, to strain to find justiciability as a basis for rendering a merely declaratory adjudication. As this point was cogently summarized in *Lister v. Board of Regents*, supra:

" 'The immunity of the state from suit, a much abused concept, is not altered or modified by the Declaratory Judgments Act. On several occasions an effort has been made to obtain a declaration of the state's duty to refund or pay money, not for the purpose of executing the judgment, which was not under the law possible, but merely to obtain an adjudication of legal rights. Its persuasive effects, to induce a legislature to make an appropriation, might be considerable. Needless to say, such a proceeding is not sustainable and a court should decline jurisdiction, even though an ostensibly suable public officer is made defendant as an *alter ego* for the state.' Borchard, *Declaratory Judgments* (2d ed. 1941), p. 374. Also see: 1 Anderson (2d ed.), *Actions for Declaratory Judgments*, p. 348, sec. 179." (240 N.W.2d at 625)

### 3.

We turn, then, to the determinative question whether the State of Maine has given its consent to be sued in this action through an act of the Legislature manifesting such consent.

█ In *Kerr v. State of Maine*, supra, the State's consent to be sued in an action directed to the imposition of other than tort liability was manifested by a Resolve of the Legislature which expressly related to the particular situation and dealt with it by prescribing a special procedure. 1927 Resolves, Chapter 237. This approach in *Kerr* is illustrative of the view hitherto generally accepted as the law of Maine (although no case squarely so decides) that where the Legislature has failed to enact a general law plainly conferring the State's consent to be sued as to a class of cases, the Legislature must deal specifically with a particular action sought to be brought against the State and give its plainly stated consent that the State be sued in that action. See

also *Turner v. Collins*, Me., 368 A.2d 1160 (1977); *Austin W. Jones Company v. State of Maine*, 122 Me. 214, 119 A. 577 (1923); *Marshall v. Maine*, 105 Me. 103, 72 A. 873 (1909).

A trend has appeared in some jurisdictions which relaxes the stringency of this requirement (of an expressly stated particularized waiver of sovereign immunity) in special situations where the Legislature has enacted a general statutory scheme plainly contemplating that the State will become a party to express contracts concerning a particular subject-matter. As to a suit brought against the State for the breach of such an express contract by the State, the State's consent to be thus sued has been found to have been legislatively conferred, even though not expressly stated by the Legislature, by necessary implication from the statutory scheme. See, for example, *Coffey v. Robert McMullan & Sons, Inc.*, 570 P.2d 1152 (Okl.1977); *Smith v. State*, 289 N.C. 303, 222 S.E.2d 412 (1976); *George & Lynch, Inc. v. State*, 7 Storey 158, 57 Del. 158, 197 A.2d 734 (1964); *V. S. DiCarlo Construction Co. v. State*, 485 S.W.2d 52 (Mo.1972); *P. T. & L. Construction Co. v. Commissioner*, 55 N.J. 341, 262 A.2d 195 (1970); *Souza & McCue Construction Co. v. Superior Court of San Benito County*, 57 Cal.2d 508, 20 Cal.Rptr. 634, 370 P.2d 338 (1962); *Ace Flying Service, Inc. v. Colorado Department of Agriculture*, 136 Colo. 19, 314 P.2d 278 (1957); *W. H. Knapp Company v. State Highway Department*, 311 Mich. 186, 18 N.W.2d 421 (1945).

In the case at bar we find no occasion to decide whether or not the law of Maine should recognize that a legislative waiver of the sovereign's immunity from suit may be found implicit in a general scheme plainly contemplating that the State will become party to particular kinds of contracts. Hypothesizing, without holding, such an extension of Maine law, we conclude that on the facts of this case no such waiver by implication may justifiably be found.

The statutory program giving rise to the present action is one in which the State of Maine was acting cooperatively with the federal government to make available public financial assistance to the aged, the blind and the disabled (AABD). See *Edelman v. Jordan*, 415 U.S. 651, 653, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). To secure federal funds in large amounts, as the bulk of the monies to be expended, the Maine Legislature submitted a plan for the approval of the United States Social Security Administration. The Legislature authorized the Maine Department of Human Services to establish a fund, in which would be included all the funds received from the federal government under the Social Security Act as well as such monies as the State would appropriate, to be used solely for the payment of medical, hospital or remedial care costs of recipients of aid to dependent children and aid to the aged, blind or disabled. 22 M.R.S.A. §§ 3351–3352. The State of Maine agreed to comply with federal conditions for eligibility for federal funds and to provide regular data and reports which the federal government might from time to time require. 22 M.R.S.A. § 3353.

Nothing in the statutory scheme gives indication that the Legislature contemplated that the State would become a party to express contracts either with the recipients of aid or the vendors of services to recipients. Rather, the statutes reveal a partnership undertaking with the federal government through which the federal government would be enabled to use the State's administrative agencies as conduits for federal funds, thus to promote a rapid distribution of national monies and an alleviation of the huge burdens of administration which would otherwise fall on the federal government.

Moreover, in no respect does this case concern a claim for a breach of an express contract. Plaintiff's complaint makes no such allegation, and the Referee's decision is based on principles of restitution. In this regard, it is of critical importance that the restitutional liability to which the State is being subjected must be defrayed solely from state funds. The liability here imposed relates to a differential in monthly payments to which the plaintiff is held entitled notwithstanding the *unlicensed* status of his nursing home facility as the vendor of the services for which payment is being required. Federal law prohibits the use of

*federal* funds to pay a nursing home for services rendered to eligible individuals while the facility is not in full compliance with State licensure requirements. 42 U.S. C.A. § 1396a at 580.[4]

■ Such being the statutory program and the nature of the liability which is here imposed on the State, far from being a necessary implication of the statutory scheme, a conclusion that the Legislature had waived the sovereign's immunity against the instant suit would be unreasonable. It is not plausible to believe that the Legislature's authorization of the State's participation as a partner with the federal government in the AABD program allowed the State's immunity (as protected by the 11th Amendment to the Constitution of the United States) to continue as against actions brought in the federal courts for monies claimed past due under the AABD program, *Edelman v. Jordan*, supra, but yet simultaneously waived the State's immunity as against suits to impose such a liability which are brought in the courts of the State. Such a conclusion would be even more anomalous as applied to the particular action now before us since it would signify that by its participation in a partnership with the federal government in which the federal government was to be the predominant partner by providing the monetary life blood of the partnership, the State nevertheless consented to a suit which would impose upon it a *sole* financial liability, federal funds not being available to satisfy the obligation.[5]

The entry is:

Appeal sustained; judgment set aside; case remanded to the Superior Court with directions to order entry of judgment dismissing the action.

4. This text states:
    "Section 234(c) of Pub.L. 90–248 provided that: 'Notwithstanding any other provision of law, after June 30, 1968, no Federal funds shall be paid to any State as Federal matching under title I, X, XIV, XVI, or XIX of the Social Security Act [subchapters I, X, XIV, XVI, or XIX of this chapter] for payments made to any nursing home for or on account of any nursing home services provided by such nursing home for any period during which such nursing home is determined not to meet fully all requirements of the State for licensure as a nursing home, except that the Secretary may prescribe a reasonable period or periods of time during which a nursing home which has formerly met such requirements will be eligible for payments which include Federal participation if during such period or periods such home promptly takes all necessary steps to again meet such requirements.' "

5. The incidents giving rise to this litigation occurred in the late spring and summer of 1970. Subsequently in 1973 these statutory provisions were repealed (1973, c. 790, Sec. 4, eff. April 1, 1974) and were replaced by Chapters 855–A and 855–B (Sections 3200–3266).

    We have examined these new sections to see if they shed any light on the issue of whether the Legislature might reasonably be said to have intended to waive sovereign immunity for suits, whether in state or federal courts, brought for violations of the AABD program. We find nothing therein which even remotely manifests such an intention. On the contrary, we find evidence of a further abdication of state responsibility and greater reliance on the federal government. Where previously Section 3351 had provided that: "The department [of Human Services] shall administer the law relating to aid to the aged, blind or disabled . . ."; the present statute, in Section 3261, provides that: "The department shall enter into an agreement with the Secretary of the United States Department of Health, Education and Welfare or its successors, under which the secretary, through the Social Security Administration, . . . shall administer the program of state supplemental income benefits authorized *in sections 3271 and 3274. . . . The de-*partment shall take any and all reasonable action to assure that such agreement shall contain provisions that the secretary shall administer the program, particularly as relates to processing of applications, receipt of benefits by eligible applicants, and hearing and reviews, in *a manner which is timely and convenient to the* applicant and beneficiary."

    We believe the new sections support our view that the Legislature has consistently relied heavily on the support of the federal government in distributing funds under the AABD program, and never intended to have *the State of Maine assume any sole liability for* actions taken in the administration of the program first predominantly funded, and now also basically administered, by the federal government.